[Nos. 14422–7–I; 14444–8–I; 14475–8–I;   Division One.   July 14, 1986.]
      14478–2–I; 14504–5–I; 14573–8–I.

ALBERT LOCKWOOD, ET AL, *Respondents,* v. A C & S, INC., ET AL, *Defendants,* PITTSBURGH CORNING CORPORATION, *Respondent,* RAYMARK INDUSTRIES, INC., *Appellant.*

*Philip A. Talmadge, Allen R. Sakai, John J. Soltys,* and *Karr, Tuttle, Koch, Campbell, Mawer, Morrow & Sax, P.S.,* for appellant.

*William S. Bailey* and *Schroeter, Goldmark & Bender,* for respondents Lockwood.

*Bruce Erickson* and *Garvey, Schubert, Adams & Barer,* for respondent Pittsburgh Corning Corporation.

GROSSE, J.—This is an appeal by Raymark Industries, Inc., from a jury verdict in favor of the plaintiffs Albert and Dorothy Lockwood (hereinafter Lockwood) for injuries resulting from Albert Lockwood's prolonged exposure during the course of his employment to asbestos products of which Raymark was a principal manufacturer. On appeal, Raymark's primary assignments of error are directed to the admission or sufficiency of evidence but, nevertheless, raise difficult and novel legal issues relating to the application of products liability law to asbestos products and exposure thereto.[1]

Lockwood worked in Seattle shipyards for 30 years, from 1942 until 1972. After 2 years, during which he was employed in the construction of new vessels, his principal employment was as a rigger and boilermaker repairing and

---

[1] "'Asbestos' is the name given to a family of hydrated silicate minerals which occur naturally as masses of fibers with the unique properties of relative indestructibility and high resistance to fire." (Footnote omitted.) Note, *The Causation Problem in Asbestos Litigation: Is There an Alternative Theory of Liability?*, 15 Ind. L. Rev. 679 (1982).

renovating older vessels. In 1972, at the age of 63, Lockwood took disability retirement having been diagnosed as having asbestosis.[2]

Asbestos was widely used on ships for insulation purposes. Lockwood's first exposure to asbestos occurred after the shipyards changed from construction of new vessels to repair work. This occurred at the conclusion of World War II. Lockwood was exposed to asbestos dust in his work as a rigger which involved using chains to move heavy equipment on the ships. The equipment was hauled by chain falls, a kind of mechanized block and tackle with a continuous chain. As the chain moves it rubs against and cuts through the insulation covering the overhead pipes creating dust.

Until 1952, Lockwood worked virtually every shipyard in the area. His exposure to asbestos was similar from one job to the next. In 1952, Lockwood moved to Lake Union Drydock where he worked for the next 20 years. He had similar exposure there. He also had exposure in using the lunchroom which was next to a compartment where asbestos was stored. Substantial dust from the storage area entered the lunchroom.

Lockwood testified that work at Lake Union Drydock

---

[2]An excellent definition of this condition can be found in Note, *The Causation Problem in Asbestos Litigation: Is There an Alternative Theory of Liability?*, 15 Ind. L. Rev. 679 n.5 (1982):

"Asbestosis is classified as a pneumoconiosis (lung disease caused by extended inhalation of a mineral or metallic dust). It is a nonmalignant response of the body to the inhalation of asbestos fibers which sets up an inflammatory process that replaces functioning lung tissue with scarred tissue. This process destroys the air sacs in the lung tissue, preventing the lung from diffusing oxygenated blood to the arteries and preventing carbon dioxide from being released. There are two types of asbestosis; parenchymal asbestosis and pleural asbestosis. These two types of asbestosis may occur simultaneously or independently. Each can be severely disabling and neither type is necessarily fatal. Currently, there is no cure for asbestosis. Also, asbestosis is generally accompanied by an enlargement of the right side of the heart (cor pulmonale) resulting from the encroachment of the scar tissue on the lung. Essentially, the heart must work harder to deliver oxygenated blood to the body, causing the right side enlargement. Deposition of Harriet Louise Hardy, M.D. at 18–23. Roderman v. Combustion Eng'r, Inc., No. C72–390 (N.D. Ohio, deposition taken on Feb. 21, 1977)".

was often on a very tight schedule requiring many trades to work simultaneously and in close quarters, sometimes up to 24 hours per day. His work included direct contact with insulation workers who actually installed or ripped out asbestos materials. Lockwood also testified that no warnings were ever given as to the possible dangers of working with asbestos nor were any warnings printed on any of the boxes of asbestos.

Lockwood had a history of cigarette smoking from his early teen years until 1972 when he was able to quit with only minor lapses thereafter. He also had a history of asthma and emphysema although neither was disabling. It was argued but not established that Lockwood was rejected for duty in the armed services in 1942 because of lung problems.

Raymark's predecessor firm, Raybestos–Manhattan, was one of the principal manufacturers of asbestos textiles from the 1920's on, particularly insulating cloth. Its products were used in the Seattle area during the period of Lockwood's employment in the shipyards. Cross respondent Pittsburgh Corning Corporation manufactured a pipe insulation containing 65 percent asbestos which was sold to a subcontractor between 1962 and 1972 when that subcontractor, E. J. Bartells, was using asbestos insulation at Lake Union Drydock. Lockwood identified a color photograph of a box of Pittsburgh Corning insulation as the same as ones he had seen during his shipyard work.

The original complaint in this matter was filed in 1982 and named 19 defendants. As with asbestos litigation occurring throughout the country, it represented only one of many similar cases involving a multitude of defendants, extensive discovery, and a long trial. Pretrial proceedings were held before a special asbestos motions judge pursuant to procedures adopted for the many cases pending. Trial commenced in September of 1983 and lasted over 2 months. Of the original 19 defendants named in the Lockwood complaint, all save 3 have been dismissed or have settled with Lockwood prior to this appeal. This is the first

of the asbestos cases filed in King County Superior Court to be considered on appeal after a full trial. As noted, Raymark is the principal actor on appeal.[3]

The primary claims of Lockwood were that the asbestos manufacturers negligently failed to warn of known dangers inherent in their products, or dangers of which they should have been aware; and that the manufacturers were strictly liable for placing on the market a product which was unreasonably dangerous since it was not accompanied by an adequate warning. Expert testimony comprised the bulk of the evidence before the jury. It included testimony as to the nature of asbestos and asbestosis as a disease, its dangerousness to individuals in general as well as to workers in factories making asbestos, and to shipyard workers in particular; and as to the complications of combining smoking with asbestosis. Substantial testimony was presented as to the knowledge of the asbestos industry and of particular defendants of the dangers of asbestos beginning in the 1930's. Lockwood also produced testimony as to whose products were being used in the shipyards generally and on some of the specific jobsites at which Lockwood worked. The jury found for Lockwood on both negligence and strict liability theories. It awarded $183,372 to Albert Lockwood but nothing to his wife on her separate loss of consortium claim. The Lockwoods had requested $748,000 in damages.

CHALLENGED EVIDENCE

The evidence to which appellant objects is as follows:

1. Sumner Simpson Papers: The "Sumner Simpson papers" are a collection of letters and reports relating to the health hazards of asbestos to workers who mined or manufactured asbestos products dating from the 1920's to the 1940's and numbering approximately 6,000 documents. These documents were collected by Sumner Simpson, president of Raybestos–Manhattan, predecessor to Raymark.

---

[3]Pittsburgh Corning Corporation and Standard Asbestos and Insulation Company were granted a new trial from which order Lockwood has appealed. This issue is discussed *infra*.

Most were found in a storage area at Raybestos–Manhattan in the early 1970's with some additional papers found in an old Raybestos–Manhattan plant safe in South Carolina in 1979. *See Lohrmann v. Pittsburgh Corning Corp.*, 782 F.2d 1156 (4th Cir. 1986); *Hendrix v. Raybestos–Manhattan, Inc.*, 776 F.2d 1492, 1498 n.13 (11th Cir. 1985). The principal documents admitted in this case were correspondence between Sumner Simpson and the counsel of the Johns–Manville Corporation between 1935 and 1940. Correspondence with other parties is included, particularly the editors of the "Asbestos" magazine.

The thrust of this evidence was that Raymark was acutely aware of potential health problems stemming from asbestos dust beginning in the 1930's, suppressed the dissemination of studies completed on the dangers of asbestos dust conducted in England in the 1930's, and also, during the 1950's, suppressed testing and/or dissemination of information on the results of testing on the dangers of asbestos dust.

2. Post–Exposure Evidence: This evidence came in two parts: American Textile Institute documents and documents prepared by the former director of environmental affairs for Raymark. As to the former, many of the documents were not post–exposure evidence but Raymark has directed its arguments on appeal primarily to that aspect of the evidence.

The American Textile Institute (ATI) documents are minutes and records of the institute which was formed in 1944 and of which Raymark was a member. These documents number more than 7,000 pages, of which only a few were admitted at trial. The ATI documents gave summaries of the proceedings of the meetings. The challenged documents begin in 1954 and end in 1971. They chronicle the industry's reactions to the increasingly severe scientific *reports* of the dangers of asbestos textile products. The gist of the evidence was that the industry was generally resistant to any scientific evidence of the dangers of asbestos but was acutely aware of that danger.

The post–exposure evidence also includes handwritten notes from 1974 and a post–1974 review of asbestos health literature from 1906 through 1973 prepared by Raymark's Director of Environmental Affairs, John Marsh, and a paper by the corporate medical director for Raybestos–Manhattan, dated 1977, on the medical aspects of occupational exposure to asbestos. The Marsh notes are particularly important since they disclose his attempts to alert the company's management to the seriousness of the asbestos health issue and his assessment of that issue.

In addition to evidentiary matters, Raymark has assigned error to the trial court's refusal to grant it a mistrial on the basis of juror misconduct; and to this court's determination that post–judgment settlements were consistent with RCW 4.22 as reasonable, thus relieving the settling defendants from any obligation of contribution to the ultimate judgment rendered for Lockwood against the remaining defendants.

## Questions Presented on Appeal

1. Were the Sumner Simpson papers relevant and admissible evidence with respect to Lockwood's claims of strict liability and negligence?

2. Should post–exposure state of the art evidence have been admitted as relevant to a theory of a continuing duty to warn?

3. Did Lockwood make a sufficient showing of exposure to Raymark's product to establish liability on the part of Raymark under either a theory of negligence or of strict liability?

4. Was the conduct of a juror who conducted "independent research" on Raymark's financial status sufficiently prejudicial as to require a new trial?

5. Is the Court of Appeals empowered to conduct an RCW 4.22 reasonableness hearing with respect to post–judgment and post–appeal settlements by two of the original defendants?

6. Did the trial court err in granting a new trial to two

defendants, Pittsburgh Corning Corporation and Standard Asbestos and Insulation Co. (hereinafter referred to only as Pittsburgh Corning), where the basis therefore was surprise evidence introduced by Lockwood at trial whereby Pittsburgh Corning's product was, for the first time, identified and placed at the workplace by Lockwood himself?

## RELEVANCE

The evidentiary issues all must be considered in the context of the present status of the law regarding product liability claims, and the particular context of product liability claims arising out of a failure to provide adequate warning. The thrust of Lockwood's case as it went to the jury, insofar as pertinent to the issues on appeal, was that Raymark was negligent in failing to warn the public of the dangers inherent to use of its product and/or that the product was unreasonably dangerous such that Raymark is liable regardless of fault in the absence of adequate warnings to the consuming public about the dangers of exposure and precautions necessary to safe use.[4]

■ The requisites of Lockwood's cause of action for negligence required a showing of the standard four elements: duty, negligent breach of the duty, causation, and harm. The focus of the inquiry is on the conduct of the manufacturer and the manufacturer's culpability.[5] Specifically as to allegations of a negligent failure to warn:

> A manufacturer can also be found negligent for failure to give adequate warning of the hazards involved in the use of the product which are known, or in the exercise of reasonable care should have been known, to the manufacturer. Restatement (Second) of Torts § 388 (1965); *Callahan v. Keystone Fireworks Mfg. Co.*, 72 Wn.2d 823, 435 P.2d 626 (1967); *Little v. PPG Indus., Inc.*, [19 Wn. App. 812, 579 P.2d 940 (1978), *modified on other grounds*, 92 Wn.2d 118, 594 P.2d 911 (1979)].

---

[4]These theories of recovery are not mutually exclusive. *Davis v. Globe Mach. Mfg. Co.*, 102 Wn.2d 68, 684 P.2d 692 (1984).

[5]*Davis v. Globe Mach. Mfg. Co.*, 102 Wn.2d 68, 72–73, 684 P.2d 692 (1984).

*Novak v. Piggly Wiggly Puget Sound Co.*, 22 Wn. App. 407, 412, 591 P.2d 791 (1979). Thus this aspect of Lockwood's case turned on evidence of "what did Raymark know and when did it know it."[6] The manufacturer's knowledge of its product and the foreseeability of the dangers latent in that product or in its intended and potential uses is the relevant inquiry in order to determine the reasonableness of the manufacturer's conduct in failing to give, or in giving, the warning that it did.

Raymark's argument as to the relevance of the Sumner Simpson papers to the negligence claim is principally one that those papers are too remote in time and subject matter to be probative of foreseeability of harm to "bystanders"[7] working in the shipyard.

Evidence is relevant if it has

> any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.

ER 401. This rule is the same as Federal Rule of Evidence 401, *see* Comment, ER 401. The pretrial motions judge specifically found that Raymark's "objection as to relevance goes to the weight of the evidence . . . rather than to their admissibility". He denied the motion to exclude all of the Sumner Simpson papers, and after reviewing each document, and receiving extensive briefing and argument, admitted only eight while excluding the majority. The evi-

---

[6] The negligent failure to warn case turns on the traditional concepts of reasonableness and foreseeability. *See Davis v. Globe Mach. Mfg. Co.*, 102 Wn.2d 68, 684 P.2d 692 (1984); *Haugen v. Minnesota Mining & Mfg. Co.*, 15 Wn. App. 379, 387, 550 P.2d 71 (1976) (quoting from 2 L. Frumer & M. Friedman, *Products Liability* § 16A[4], at 3–336.3 (1960)).

[7] This term was apparently coined by the author of Note, *The Causation Problem in Asbestos Litigation: Is There an Alternative Theory of Liability?* 15 Ind. L. Rev. 679, 681 (1982), wherein it is defined at footnote 17:
> For the purposes of this Note, a bystander is a worker who did not work directly with asbestos products, but was working in close proximity with workers using asbestos products so as to be exposed to similar concentrations of asbestos dust.

dence contained in these papers of the dangers associated with the use and handling of asbestos is relevant in a negligence claim where an element of proof is knowledge of the dangerous propensities of the product.[8]

Although Raymark argues the evidence only pertains to asbestos plant workers or miners and not to shipyard workers we are unpersuaded, as were the Eleventh and Fifth Circuits.[9] In *Jackson v. Johns–Manville Sales Corp.,* 750 F.2d 1314, 1318–19 (5th Cir. 1985), the Fifth Circuit (en banc) ruled that the Sumner Simpson papers were relevant as to shipyard workers since the letters "pertain to the problems of asbestos dust control in general" and that any distinction between shipyard workers and factory workers "plainly goes more to the weight than to the admissibility of the evidence." The court specifically ruled that the papers were not irrelevant for remoteness in subject matter or time because of their general nature regarding asbestos dust control and because evidence of such knowledge in 1935 made a shipyard worker's allegation that the dangers of asbestos dust at the time of his exposure in 1953 were foreseeable more probable than it would have been without use of the papers. *Jackson,* at 1319. The same is true here.[10]

---

[8]*See Hendrix v. Raybestos–Manhattan, Inc.,* 776 F.2d 1492, 1498–1500 (11th Cir. 1985) (Sumner Simpson papers admissible in negligent failure to warn action as relevant on the issue of manufacturer's knowledge of dangerousness of the product and permitting the inference that workers handling asbestos insulation products were equally susceptible to asbestosis); *Jackson v. Johns–Manville Sales Corp.,* 750 F.2d 1314, 1318–19 (5th Cir. 1985). The same Sumner Simpson papers were admitted in this case.

The only appellate court to rule the papers inadmissible affirmed the trial court's ruling where Johns–Manville was not a party and the plaintiffs made no showing of contact with Raybestos products resulting in a dismissal by the trial court of Raymark as a party. *See Lohrmann v. Pittsburgh Corning Corp.,* 782 F.2d 1156 (4th Cir. 1986).

[9]*Jackson v. Johns–Manville Sales Corp.,* 750 F.2d 1314, 1318–19 (5th Cir. 1985); *Hendrix v. Raybestos–Manhattan, Inc.,* 776 F.2d 1492, 1498–1500 (11th Cir. 1985).

[10]Although *Jackson v. Johns–Manville Sales Corp.,* 750 F.2d 1314 (5th Cir.

The motions court also ruled that the papers could be used "at the discretion of the trial court in strict liability claims in the event that Raymark denies dangerousness or feasibility." Nothing in the record or in the briefs indicates whether the trial court passed on this point or what its ruling was if it did. While Raymark continued to deny its products were dangerous throughout the trial, it did not request an instruction limiting use of the evidence only to negligence once admitted.

██ The question of the relevance of the Sumner Simpson papers to Lockwood's strict liability claim is a much closer one. A recent opinion of the Ninth Circuit aptly summarizes the substance of Washington law on strict liability as it applies in the context of asbestos related injuries. *Kisor v. Johns–Manville Corp.,* 783 F.2d 1337 (9th Cir. 1986). There, the plaintiff decedent had contracted cancer as a result of his inhalation of asbestos fibers over an extended period. The case was sent to the jury solely on the theory of strict liability. The defendants were permitted by the trial court to present evidence of their ignorance during the relevant time period of the long–term harm associated with low level asbestos exposure. The jury was instructed correctly with regard to the requisites of a claim under Washington law for strict products liability, but the trial court refused a requested instruction by the plaintiff which would have informed the jury that the duty of a manufacturer to provide adequate warnings of an inherent danger in its product is not met by a showing that the defendant was unaware of a product's dangerousness. The jury returned a general defense verdict and the plaintiff appealed, alleging it was error to admit the evidence of medical industry knowledge at the time of exposure concerning hazards and error to refuse the requested instruc-

---

1985) involved punitive damages, we do not read that opinion to say that the Sumner Simpson papers were only admitted for purposes of punitive damages. Further, punitive damages were in no way an issue in *Hendrix v. Raybestos–Manhattan, Inc.,* 776 F.2d 1492 (11th Cir. 1985), which found the papers relevant as to notice of the product's dangerousness under a negligence theory.

tion with regard to ignorance of harm. The court summarized the applicable law as follows:

> In Washington, in determining the adequacy of a warning in a strict liability action, the question is: "Was the warning sufficient to catch the attention of persons who could be expected to use the product; to apprise them of its dangers and to advise them of the measures to take to avoid those dangers?" *Little v. PPG Industries, Inc.*, 92 Wash.2d 118, 122, 594 P.2d 911, 914 (1979). The focus is on the warning itself and the reasonable expectations of the consumer, not upon the manufacturer's conduct. *Id.*

In another case we asked the Washington Supreme Court to decide the admissibility of evidence of compliance with industry customs and standards when offered by the defendant as evidence of the reasonable expectation of the ordinary consumer. Its answer:

> Introducing evidence of industry and/or manufacturer's customs and practices shifts the jury's focus from what the consumer expects to what the manufacturers are doing. By focusing the jury's attention on the custom of the industry, implicitly the jury's attention is focused on the defendant's design choice and the reasonableness of that choice. In effect, such evidence incorporates negligence concepts and the seller oriented approach we rejected in *Estate of Ryder v. Kelly–Springfield Tire Co.* [91 Wash.2d 111, 587 P.2d 160 (1978)]. This is not appropriate in actions alleging strict liability under Section 402A.
>
> > The rule is one of strict liability, making the seller subject to liability to the user or consumer even though he has exercised all possible care in the preparation and sale of the product. . . .
>
> . . . The plaintiff takes design as it was finalized in the finished product and shows it was not reasonably safe because the user would not contemplate the danger in the normal and innocent use of the product or consumption of the product. The liability of the manufacturer is measured solely by the characteristics of the product he has produced rather than his behavior and, therefore, strict liability does not sound in negligence. (citations omitted).

*Lenhardt v. Ford Motor Co.*, 102 Wash.2d 208, 212–13, 683 P.2d 1097, 1100 (1984).

Owens–Illinois's inquiries about medical knowledge in the industry and industry standards impermissibly put negligence concepts before the jury. These are irrelevant in a strict products liability case under Washington law. Nor should the defense have been allowed to argue in closing that ignorance of the product's danger is a defense to strict products liability. This argument misstated the state law and, coupled with the expert testimony, allowed the jury to conclude that if Owens–Illinois did not know of the danger of its product, it could not be held liable.

(Footnotes omitted.) *Kisor,* at 1341.

The Ninth Circuit held that the evidence of medical knowledge in the industry improperly put negligence concepts before the jury, that the evidence was irrelevant and that since the trial judge did not strike the evidence or admonish the jury to disregard it the verdict was probably tainted by that evidence. The court further held that the instruction requested by the plaintiff was necessary in view of the fact that the evidence of knowledge or lack thereof had been admitted and the fact that the case was sent to the jury solely on the strict product liability claims. The court specifically juxtaposed its decision in *Kisor* with the decision of the Washington State Supreme Court in *Gammon v. Clark Equip. Co.,* 104 Wn.2d 613, 707 P.2d 685 (1985), because *Gammon* was tried on theories of both negligence and strict liability. Because the instant matter was tried on both theories we look to *Gammon.*

In *Gammon* the issue before the court was whether in the context of a case involving both theories of negligence and of strict liability for failure to provide adequate warnings the jury must necessarily be instructed that the reasonable care of the manufacturer of the product is not a defense if the product is not reasonably safe. The plaintiffs asserted that the instruction was necessary to clarify the distinction between the two theories and prevent confusion of the jury, citing to *Little v. PPG Indus., Inc.,* 19 Wn. App. 812, 579 P.2d 940 (1978), *modified on other grounds,* 92 Wn.2d 118, 594 P.2d 911 (1979). The majority in *Gammon* held that

the clarifying instruction was not necessary if the remaining instructions taken as a whole differentiated between the two theories, and that the instructions in *Gammon* did so.

The relevant instructions to the jury in the instant case are set forth in the appendix. A review of those instructions demonstrates that they are carefully crafted and accurately distinguish between the theories of products liability and negligence. Indeed, each instruction related to liability was given a heading to inform the jury as to whether it applied to one or the other of the theories or to both. Taken as a whole the instructions were an adequate and accurate statement of the law with no tendency to confuse. *See Gammon.*

■ Raymark does not assign error to these instructions on appeal nor did it request an instruction at trial limiting consideration of the Sumner Simpson evidence only to Lockwood's negligence claims; yet it contends on appeal that admission of the evidence was error because it was in no way relevant to strict liability theories. While we agree that the evidence was irrelevant in the context of the trial of the strict liability theories, the error was not preserved for appeal. Absent a request for a limiting instruction, evidence admitted as relevant for one purpose is considered relevant for others.[11] Moreover, Raymark's failure to request that limiting instruction or, at the very least, an instruction clarifying that the extent of or lack of a manufacturer's knowledge of the nature of its product is not an element of proof of the claim is underscored in the context of carefully crafted and unambiguous instructions such as those given in the instant matter. Therefore, whatever error there may have been with respect to admission of the Sumner Simpson papers as they pertain to Lockwood's theories of strict liability, Raymark failed to preserve it.[12] ER

---

[11]ER 105 and Comment. *See* 5 K. Tegland, Wash. Prac., *Evidence* § 24, at 65 (1982). As Professor Tegland notes, the trial court may give a limiting instruction sua sponte, but is not required to do so.

[12]We note that Raymark's position with regard to the limits of dangerousness

103(a)(1); *Davis v. Globe Mach. Mfg. Co., supra* at 75; *Klink v. G.D. Searle & Co.,* 26 Wn. App. 951, 956, 614 P.2d 701, 9 A.L.R.4th 364 (1980).

Raymark faces similar problems to those discussed above in its challenge to the relevance of the post–exposure state of the art evidence as proof of Lockwood's claims of a continuing duty to warn. Again, Lockwood's claim of a continuing duty is based on theories of both negligence and strict liability.

■ Washington law recognizes a continuing duty to warn sounding in negligence under circumstances where a manufacturer becomes aware of the defect or dangerous aspect of its product even though that defect or danger is discovered after the product has left its hands. The duty attaches when the risk becomes apparent to the manufacturer even though it was not known or foreseeable when the product was initially marketed. *See Ewer v. Goodyear Tire & Rubber Co.,* 4 Wn. App. 152, 480 P.2d 260 (1971) (citing *Comstock v. General Motors Corp.,* 358 Mich. 163, 99 N.W.2d 627, 78 A.L.R.2d 449 (1959)). *Accord, Basko v. Sterling Drug, Inc.,* 416 F.2d 417 (2d Cir. 1979).

Lockwood contends that had he been apprised of the nature of asbestos products and asbestosis even after his cessation of employment in the industry he could have altered his behavior and reduced his disability by stopping smoking. The question comes down to one of whether any information acquired by Raymark after Lockwood's disability retirement could have prevented or minimized the harms complained of: Whether, once exposure ceased, but the lungs continued to contain asbestos fibers, a warning

---

is somewhat different from that of the manufacturers raising this issue in other cases. Here, Raymark wants to exclude not only the Sumner Simpson papers, but, as will be discussed below, other state of the art evidence as prejudicial to its defense whereas in most cases manufacturers attempt to admit evidence of knowledge of danger to establish their defense of the lack of such knowledge. This approach appears to have been attempted by at least one other manufacturer and with a similar lack of success. *See Johns–Manville Sales Corp. v. Janssens,* 463 So. 2d 242 (Fla. Dist. Ct. App. 1984).

could have been given which could have prevented or minimized the harm? Lockwood presented expert testimony that cigarette smoking aggravated asbestosis and the development of the disease and compounded his injuries. Therefore post–exposure evidence was relevant to the negligence claim in view of the impact of smoking on asbestosis and victims of asbestosis.[13]

As with the Sumner Simpson papers, Raymark takes the position that even if the evidence was relevant to the negligence claim it was irrelevant and highly prejudicial with respect to theories of strict liability. Here again, Raymark is in a somewhat unusual position with respect to its arguments on state of the art evidence and strict products liability claims. For the most part, these arguments have been raised in the context of cases wherein defendants such as Raymark have sought the admission of state of the art evidence to show that at the time of manufacture and distribution of a product that is unreasonably dangerous they did not and could not have known of the dangers so as to provide the necessary adequate warnings. This was the question posed in *Lenhardt v. Ford Motor Co.*, 102 Wn.2d 208, 683 P.2d 1097 (1984). There, the court took up the following question on certification from the Ninth Circuit Court of Appeals.

> In a strict liability cause of action arising prior to the effective date of the Washington Tort Reform Act, codified in RCW 7.72.010 *et seq.*, is evidence of compliance with industry customs and standards always admissible as a relevant factor in evaluating the reasonable expectation of the ordinary consumer.[14]

---

[13]Raymark asserted in argument and by supplemental authority that the jury was not instructed on a continuing duty to warn. We do not agree. A continuing duty to warn is implicit in the final paragraph of instruction 13, see appendix, which was not objected to at trial and thus becomes the law of the case. Instruction 13 provided a sufficient legal basis for Lockwood to argue his negligence theory of a continuing duty to warn.

[14]As with *Lenhardt v. Ford Motor Co.*, 102 Wn.2d 208, 683 P.2d 1097 (1984), Lockwood's claim arose before the effective date of the 1981 tort reform act, codified at RCW 7.72.010 *et seq. See Sahlie v. Johns–Manville Sales Corp.*, 99 Wn.2d

*Lenhardt,* at 209. The *Lenhardt* court restates the distinction between the focus of the inquiry in negligence cases and strict products liability cases and attempts to answer the query as follows:

> In that the reasonableness of the defendant's conduct is irrelevant in strict liability cases, industry custom and standards, which form the basis of the defendant's conduct, are equally irrelevant. Strict liability is predicated upon a no–fault concept and evidence that other manufacturers do the same thing as the defendant introduces concepts of fault that are not relevant to the reasonable expectation of the ordinary consumer.
>
> . . . when a plaintiff establishes at trial that a particular design allows a certain event to occur and alleges that event is not reasonably safe based upon the reasonable consumer expectation concerning that product, the defendant may not introduce evidence that his design comports with the design of other manufacturers, *i.e.,* industry custom, and, therefore, is reasonably safe because the other designs allow the same event to occur. If a product as designed is not reasonably safe liability attaches and a defendant is liable no matter how reasonable his conduct. *Teagle v. Fischer & Porter Co.,* 89 Wn.2d 149, 159, 570 P.2d 438 (1977).

*Lenhardt,* at 213–14. The *Lenhardt* court relies heavily on *Estate of Ryder v. Kelly–Springfield Tire Co.,* 91 Wn.2d 111, 587 P.2d 160, 16 A.L.R.4th 129 (1978). *Ryder* clearly establishes that the test for strict products liability is the same where the allegation of dangerousness arises out of a failure to warn in contrast to a design defect. In neither *Ryder* nor *Lenhardt* did the court directly face the issue posed by this case: Did Raymark have a duty to warn prior users of its products of the dangers of which it was not in fact aware until after the plaintiff ceased use? So formulating the issue thrusts one into the throes of a continuing debate over the time frame within which a defendant manufacturer's knowledge of the dangers of its product and the

---

550, 663 P.2d 473 (1983). The provisions in RCW 7.72.030(1)(b), (c) and RCW 7.72.050, which permit state of the art evidence and the state of the art defense in strict products liability claims thus do not apply to this case.

adequacy of warnings with respect to its use are to be measured.[15]

In this case the evidence was introduced at the behest of Lockwood to prove that the dangerous propensities of asbestos encompassed the injuries he suffered and continued to suffer from cigarette smoking while afflicted with asbestosis. Lockwood continued to be a consumer of Raymark's product during all material times that the product placed him at risk. The relevant question is the danger inherent in the product: whether a warning could have been given that would render the product safe or at least less dangerous to the ordinary consumer; and whether a warning was given. The focus is on the product and the expectations of a reasonable consumer. *See Lenhardt,* at 213–14; *Ryder,* at 117–18.

> As strict products liability in tort was originally conceived, the manufacturer's ability to know of the danger of its product at the time of sale was immaterial. Under pure strict liability theory, the product is on trial, not the knowledge or conduct of the manufacturer. Subsequently, additional products liability theories developed which permit the plaintiff to recover when the manufacturer fails to give adequate warning or adopt an alternate design to make the product safer.

*Halphen v. Johns–Manville Sales Corp.,* 484 So. 2d 110, 113 (La. 1986). As to the expectations of the consumer

> [a] duty to warn attaches, not when scientific certainty is established, but whenever a reasonable man would want to be informed of the risk in order to decide whether to expose himself to it.

(Citations omitted.) *Johns–Manville Sales Corp. v. Janssens,* 463 So. 2d 242, 251 (Fla. Dist. Ct. App. 1984).

In the instant case then, the question comes down to whether Raymark was under a duty to warn of dangers of

---

[15]*See generally* an outstanding student work thoroughly exploring both the history and current scope of this problem and its impact on tort law. Note, *Rise of the Phoenix—Feldman v. Lederle Laboratories: From the Remnants of State of the Art Evidence Comes a New Standard for Design Defect–Failure To Warn Cases,* 16 Toledo L. Rev. 1053 (1985).

which it was not aware until after Lockwood's exposure, or whether its duty to warn arose only when it learned of the specific post–exposure risks. The Restatement and a number of jurisdictions adopt the latter approach.[16] Washington has opted for the former.[17] Under Washington's approach all evidence of the nature of the product and its dangers which assists the trier of fact to determine whether the product was unreasonably dangerous is relevant.

The question can be further refined: Why isn't "what is good for the goose good for the gander"? Raymark would have introduced similar evidence if it had been permitted to do so to show as a defense that it could not warn about which it did not know. Since it could not get the evidence admitted for that purpose it argues that such evidence is irrelevant for all purposes; but in making that argument it fails to carefully distinguish between the theories and authorities discussed above. The American Textile Institute and Marsh evidence was relevant and admissible to prove dangerousness in general, and that those with asbestosis who smoked cigarettes were at an increased risk due to the nature of the product. To escape strict liability for the harm flowing from the risk Raymark would have had to provide adequate warning.

As before, a good portion of Raymark's concerns over this

---

[16]*See* Restatement (Second) of Torts § 402A, comment *j* (1965); *Gideon v. Johns–Manville Sales Corp.,* 761 F.2d 1129, 1143 (5th Cir. 1985) (applying Texas law). *See also* Note, 16 Toledo L. Rev. 1053 (1985).

[17]Any injection of negligence principles into the determination of liability under strict products liability has been consistently rejected. *Teagle v. Fischer & Porter Co.,* 89 Wn.2d 149, 159, 570 P.2d 438 (1977); *Estate of Ryder v. Kelly–Springfield Tire Co.,* 91 Wn.2d 111, 117–18, 587 P.2d 160, 16 A.L.R.4th 129 (1978); *Little v. PPG Indus., Inc.,* 92 Wn.2d 118, 120–23, 594 P.2d 911 (1979) (disapproving use of the negligence concept of foreseeability contained in comment *h* to § 402A of the Restatement (Second) of Torts (1965) on whether a warning is required); *Lenhardt v. Ford Motor Co.,* 102 Wn.2d 208, 212, 683 P.2d 1097 (1984). *Compare Feldman v. Lederle Laboratories,* 97 N.J. 429, 479 A.2d 374, 386 (1984). Missouri and Louisiana also take this approach. *See Elmore v. Owens–Illinois, Inc.,* 673 S.W.2d 434, 438 (Mo. 1984); *Halphen v. Johns–Manville Sales Corp.,* 484 So. 2d 110 (La. 1986).

evidence could have been alleviated by a request for a limiting instruction. This Raymark did not do. As a result, as discussed above, it failed to preserve whatever error there may have been.

■ As to both the Sumner Simpson papers and the post–exposure state of the art evidence Raymark argues that, even if relevant, these materials were unfairly prejudicial and confusing so that their exclusion was required under application of ER 403. We disagree. ER 403 provides the trial court with the discretion to exclude relevant evidence if it finds its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues or misleading the jury, or that such evidence may unduly waste time or present cumulative evidence. The standard of review is manifest abuse of discretion. *State v. Gatalski,* 40 Wn. App. 601, 610–11, 699 P.2d 804 (1985). *Gatalski* recognizes the application of the rule by federal courts and the text of the rule itself that tremendous discretion is left with the trial court on the exclusion of relevant evidence. *See* 1 J. Weinstein & M. Berger, *Evidence* ¶ 403[01]–[03] (1985), especially pages 403–7 through 403–9 and cases at footnotes 6, 7. These cases indicate the trial court is rarely overruled when admitting evidence and, where it is, the evidence admitted had little or no relevance but extreme prejudice. *See also State v. Sargent,* 40 Wn. App. 340, 347–49, 698 P.2d 598 (1985) (admission of gruesome photos of murder victim was prejudicial error under ER 403 where one had "marginal relevance" to proof of premeditation and the other two had no relevance).

The text of the rule requires balancing the prejudicial costs of the evidence against its benefits. If its probative value is not "substantially" outweighed by the danger of unfair prejudice the court has no discretion to exclude the evidence: it must be admitted. However, if the balance is substantially in favor of prejudice, the judge need not exclude the evidence, but merely has the discretion to do so. *See* 22 C. Wright & K. Graham, *Federal Practice* § 5214, at 263–64 (1978). This broad discretion and deference

accorded the trial court is underscored in *State v. Coe,* 101 Wn.2d 772, 782, 684 P.2d 668 (1984).

The relevant Sumner Simpson papers should only be excluded here if *unfairly* prejudicial. The advisory committee's note to Fed. R. Evid. 403 states in part that "'unfair prejudice' means an 'undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one.'" 1 J. Weinstein & M. Berger, *Evidence* ¶ 403[03], at 403–33 (1985). This accords with prior state law, *see State v. Stevenson,* 16 Wn. App. 341, 346, 555 P.2d 1004 (1976). Another commentator has indicated that unfair prejudice may exist where evidence is admitted which distorts the truth but which cannot be effectively rebutted or clarified. *See* Gold, *Federal Rule of Evidence 403: Observations on the Nature of Unfairly Prejudicial Evidence,* 58 Wash. L. Rev. 497, 508 (1983).

In this case Raymark took full advantage of the opportunity to present clarifying evidence to put the Sumner Simpson papers in a proper context so that the jury would be able to use them accurately. Further, there is nothing in the letters themselves which is so inflammatory as to call for their exclusion. As the Fifth Circuit stated in *Jackson v. Johns–Manville Sales Corp.,* 750 F.2d 1314 (5th Cir. 1985), "Nothing in the letters is of such an inherent nature as to inflame the passions of the jury or invoke its sympathies." *Jackson,* at 1319. There was no abuse in refusing to exclude the papers in the negligence claim under ER 403. *See Hendrix v. Raybestos–Manhattan, Inc.,* 776 F.2d 1492, 1501–02 (11th Cir. 1985), affirming admission of the Sumner Simpson papers after applying ER 403.

As with the Sumner Simpson papers, the post–exposure evidence met the test for admissibility and the trial court did not abuse its discretion.[18]

---

[18]Raymark also challenged the authenticity of the Sumner Simpson papers, a challenge we reject. The motions court made specific findings admitting the Sumner Simpson papers which met the three listed conditions under the ancient documents exception of ER 901(b)(8). The court found no reasonable grounds for creating a suspicion concerning the authenticity of the papers and found them

## PRODUCT IDENTIFICATION

Raymark contends the trial court erred in denying its motions for a directed verdict, judgment notwithstanding the verdict, or a new trial because Lockwood was never able to specifically identify Raymark asbestos products as ones to which Lockwood was directly exposed. Raymark argues Lockwood thus failed to establish the requisite proximate cause for either negligence or strict products liability theories.

The trial court ruled that there was sufficient credible testimony or inferences which could be drawn therefrom to establish that if the asbestos products were located in a shipyard they were actually used on the jobsite and did not remain solely in the warehouse. In addressing the specific arguments made by defendants the trial court stated:

> [E]ven if the product was used on the job site there is no evidence that the plaintiff was exposed to the asbestos fibers from that particular product either because the quantities available to be used in comparison to the totality of the quantity available was minor . . . or because of the argument that he was working as a ship-

---

authentic as a matter of law; that they were located in a place where if authentic they would likely be; and that those which on their face indicated they were 20 years old or older were of that age and were authenticated. The factual basis for these findings was in the deposition of William Simpson, an officer of Raymark and son of the deceased Sumner Simpson. ER 901(a) provides that evidence must be authenticated to be admissible and that authentication "is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." William Simpson's deposition provides sufficient evidence to support the findings in the order. We also find persuasive the host of federal and state courts which have admitted these same papers as authentic. In addition to the Fifth and Eleventh Circuits, the following appellate courts have relied on the papers: *Cathey v. Johns–Manville Sales Corp.*, 776 F.2d 1565, 1573 (6th Cir. 1985); *Johns–Manville Sales Corp. v. Janssens*, 463 So. 2d 242, 249–50 (Fla. Dist. Ct. App. 1984); and *Fischer v. Johns–Manville Sales Corps.*, 193 N.J. Super. 113, 472 A.2d 577, 580–81 (1984). Similarly, the post–exposure evidence meets the requirements of authenticity.

Raymark also challenges in its reply brief the admission of evidence obtained from its Director of Health and Environmental Affairs, John Marsh, under ER 801, as hearsay. However, the record before us fails to disclose an objection to the trial court or an assignment of error here on that basis; we therefore will not consider the issue for the first time on appeal.

fitter and not exposed "to insulators" . . . [this argument] has to be measured against the . . . [expert testimony] with reference to the ability of the product to drift and remain in the ambient air for long periods of time once it enters or is released into the air. . . .

I think what we have to keep in mind . . . Mr. Lockwood has asbestosis. For purposes of this motion, there really isn't any reason to question that in terms of all the evidence being drawn in the light most favorable to the plaintiff. We know that only asbestos causes this asbestosis. We know that he was exposed "[f]rom the experts' point of view" and from [the motion court's] point of view by simply being in the same job site or shipyard as these products.

And after that, it's pretty much the job of the jury to decide whether . . . given all the evidence in the case, there has been enough shown.

The court stressed that this was a factual argument about sufficiency of the evidence which would ultimately be decided by the trier of fact. The critical ramification of this ruling was that Lockwood had established a prima facie case in providing evidence of the drift theory of exposure linked to causation of the disease, plus evidence of the presence of the products on the jobsite. Thus, the defendants would be liable as a matter of law absent presentation of exculpatory evidence.

■ A directed verdict, judgment notwithstanding the verdict, or motion for a new trial on sufficiency of the evidence each involve the same standard of review. The non-moving party's evidence must be accepted as true with all favorable inferences that may reasonably be drawn from them. The motion may only be granted if, as a matter of law, no evidence or reasonable inference drawn from it could sustain a verdict for the nonmoving party. *Phennah v. Whalen,* 28 Wn. App. 19, 22, 621 P.2d 1304 (1980), *review denied,* 95 Wn.2d 1026 (1981). "If there is any justifiable evidence upon which reasonable minds might reach conclusions that sustain the verdict, the question is for the jury." *Levy v. North Am. Co. for Life & Health Ins.,* 90 Wn.2d 846, 851, 586 P.2d 845 (1978). There is no dispute

that Lockwood could not make a specific identification of Raymark's products at any of his work sites.

Reversal is required if Raymark is correct that, as a matter of law, Lockwood must specifically identify Raymark products for them to be held to be a proximate cause of his injury. However, such a rule would present an impossible task for plaintiffs in most asbestos cases. The victim has little or no opportunity to identify the products used 20 or more years earlier. The pretrial motions court and the trial court both realized this difficulty and properly perceived Washington's approach to tort law as one which favors consumers or ultimate users of products. *See Lenhardt v. Ford Motor Co.,* 102 Wn.2d 208, 212, 683 P.2d 1097 (1984); *see generally Martin v. Abbott Laboratories,* 102 Wn.2d 581, 689 P.2d 368 (1984) as to this State's attempts to construe legal theories in a manner that will provide plaintiffs with causes of action which may realistically allow for a recovery. *See also Zamora v. Mobil Oil Corp.,* 104 Wn.2d 199, 206, 704 P.2d 584 (1985) ("consumer protection is the ultimate factor considered by this court" in extending liability to remote sellers).

We find the approach taken by the motion and trial courts appropriate based on the evidence before them as to the nature of asbestos, the causes of asbestosis, the nature of work in the shipyards and Lockwood's activities there. No direct evidence of specific product identification was necessary given the expert testimony as to the cumulative effect of all asbestos exposure in contributing to the contraction of asbestosis. Circumstantial evidence may establish the entire basis for recovery under either negligence or strict products liability. *Ewer v. Goodyear Tire & Rubber Co.,* 4 Wn. App. 152, 157, 480 P.2d 260 (1971). *See also Wise v. Hayes,* 58 Wn.2d 106, 108, 361 P.2d 171 (1961) (circumstantial evidence sufficient to establish liability in negligence and implied warranty for failure to properly label defective insecticide); *Hernandez v. Western Farmers Ass'n,* 76 Wn.2d 422, 425–26, 456 P.2d 1020 (1969). *See also Roehling v. National Gypsum Co.,* 786 F.2d 1225 (4th Cir.

1986) (circumstantial evidence is sufficient to state a cause of action in an asbestos case where the witnesses could place decedent plaintiff in the same factory area at the time when the defendants' asbestos products were used). The requirements of such circumstantial evidence in this state are not new, as noted by the *Ewer* court:

> [T]he evidence must present something more than a mere possibility or conjecture, [and] it is equally sound that the cause of an accident may be inferred from circumstances. A plaintiff in this character of case is not obligated to establish the material facts essential to a recovery beyond a reasonable doubt. Such a rule would amount to a denial of justice. *It is sufficient if his evidence affords room for . . . reasonable minds to conclude that there is a greater probability that the accident causing the injury happened in such a way as to fix liability upon the person charged with such liability, than it is that it happened in a way for which the person so charged would not be liable.* 'There are very few things in human affairs, and especially in litigation involving damages, that can be established to such absolute certainty as to exclude the possibility, or even some probability, that another cause or reason may have been the true cause or reason for the damage, rather than the one alleged by the plaintiff. But such possibility, or even probability, is not to be allowed to defeat the right of recovery, where the plaintiff has presented to the jury sufficient facts and circumstances surrounding the occurrence as to justify a reasonable juror in concluding that the thing charged was the prime and moving cause.' In other words, the plaintiff is only required to satisfy the jury, by a fair preponderance of the evidence, that the accident . . . occurred in the manner he contends it did.

*Ewer*, at 158–59 (quoting *Tubb v. Seattle*, 136 Wash. 332, 337, 239 P. 1009 (1925) and *St. Germain v. Potlatch Lumber Co.*, 76 Wash. 102, 135 P. 804 (1913)).[19]

---

[19]Raymark cites *Gideon v. Johns–Manville Sales Corp.*, 761 F.2d 1129, 1145 (5th Cir. 1985) as supplemental authority in support of its argument that there was insufficient evidence identifying Raymark's products. Because Texas law on strict liability applied as recognized in *Borel v. Fibreboard Paper Prods. Corp.*, 493 F.2d 1076, 1080 (5th Cir. 1973), *cert. denied*, 419 U.S. 869, 42 L. Ed. 2d 107,

The testimony presented in this case meets the burden set forth above. Based on the evidence before them, both the motions court and the trial court acted properly in shifting the burden of proof to the defendant by holding that a prima facie case had been established against them once their products had been located in the shipyards where Lockwood worked during the period that Lockwood was there.[20]

---

95 S. Ct. 127 (1974), neither *Gideon* nor its predecessors assist us on this issue. Under those cases the focus is different from that in Washington. There the plaintiff must show that the manufacturer knew or should have known of the dangerous propensities of the product "when the products were sold", *Gideon*, at 1143, 1145, permitting a "state of the art defense" unlike Washington where the manufacturer's knowledge at the time of sale is irrelevant in strict products liability lack of warning cases. Further, the facts of that case indicated that Gideon failed to establish that any dust was created in his work of switching Raymark asbestos textiles from one carton to another in the warehouse, while Raymark's expert presented unchallenged testimony that no dust was created in such activities or during shipping. *Gideon*, at 1144. The proofs in this case are vastly different.

[20]This case was presented to the jury on the theory of joint and several liability. Instruction 6, with respect to which no error has been assigned on appeal, provided:

There may be more than one proximate cause of the same alleged harm.

When the concurring negligence and/or product liability of two or more defendants are each proximate cause of an injury, each is liable regardless of the relative degree in which each contributes to the injury.

If you find that the sole proximate cause of the plaintiff's injury was the act or omission of some other person or entity who is not a party to this lawsuit, then your verdict should be for the defendants.

Therefore, except that *Martin v. Abbott Laboratories,* 102 Wn.2d 581, 689 P.2d 368 (1984) provides support for the policies underlying our ruling on this point, we need not discuss the case at length nor attempt to point out distinctions between asbestos products and generic drugs, insofar as *Martin* approves an "alternate market share" approach to liability for those drugs. A variation of that approach may well be advisable in the proper case however. See the excellent analysis of this issue in Note, *The Causation Problem in Asbestos Litigation: Is There an Alternative Theory of Liability?,* 15 Ind. L. Rev. 679 (1982). *See also Celotex Corp. v. Copeland,* 471 So. 2d 533, 536–39 (Fla. 1985) (rejecting the alternate market share approach adopted by the Florida District Court of Appeals (447 So. 2d 908, 913–16 (1984)) because the plaintiff was able to identify the products of 11 defendants and place those products at the work site, but reserving to a later case whether such an approach would be appropriate).

### JUROR MISCONDUCT

Raymark charges that the "independent research" of one juror in looking up various defendants on the stock exchange and then stating to the jury that their listings indicated an apparent ability to pay while at the same time proposing a "high" figure for damages was reversible error.[21] It claims that it is reasonably doubtful whether the misconduct affected the verdict and thus the trial court abused its discretion in denying the motion for a new trial, relying on *Gardner v. Malone*, 60 Wn.2d 836, 376 P.2d 651, 379 P.2d 918 (1962). Raymark further charges that the misconduct was not remedied by the trial court's curative instruction given upon report of the alleged misconduct.[22]

█ Appellate courts will generally not examine how the jury collectively or as individuals goes about reaching its verdict. *State v. Gay*, 82 Wash. 423, 438–39, 144 P. 711 (1914); *Gardner*, at 841–43. An exception to this rule exists where a juror injects novel evidence into the deliberations. This is considered improper because such new evidence will not have been subject to objection, cross examination, explanation, or rebuttal by either party. *Halverson v. Anderson*, 82 Wn.2d 746, 752, 513 P.2d 827 (1973). The trial court will normally review this alleged new evidence and then determine whether the juror's remarks or the new evidence itself probably had a prejudicial effect on the minds of the other jurors. *Gardner v. Malone, supra* (relying on *State v. Parker*, 25 Wash. 405, 415, 65 P. 776 (1901)). The trial court then has the discretion to grant or deny a new trial after viewing juror affidavits or examining jurors, which will not be overturned absent an abuse of dis-

---

[21]The juror proposed $250,000; Lockwood asked for $748,000. The final award was $183,000.

[22]Instruction 20b reads as follows:

"The jury is instructed that should there be a finding of liability for the plaintiff against any defendant the financial circumstances of the particular defendant or defendants is not to be considered by the jury in determining the amount of damages proximately resulting from a defendant's liability, if any."

cretion. *Gardner,* at 846. If the trial court finds after examination of the full record that

> it is *reasonably doubtful* whether or not the improper conduct affected the amount of the verdict or the decision of any other material issue, the verdict should be set aside by the trial judge; if, in such a case, a new trial is not granted, there is an abuse of discretion by the trial judge, and reversal becomes the duty of appellate courts . . . when misconduct is once shown, and there is *reasonable doubt* as to its effect, that doubt must be resolved against the verdict.

*Gardner,* at 846.

In this case the trial court gave a curative instruction immediately after the misconduct was discovered and then conducted an extensive hearing after the verdict was returned. The jury foreman testified at the post–verdict hearing that the jury was relieved upon receiving the curative instruction and the issue did not come up again in the deliberations.

This case is unique because the misconduct was discovered prior to rendering the verdict so that a curative instruction could be given. Juries are presumed to follow instructions, including curative instructions. Although no Washington cases discuss the giving of curative instructions during the jury's deliberations for alleged misconduct, a number of cases from other jurisdictions indicate that misconduct may be cured with an instruction rather than a new trial.[23]

---

[23]*See Keyes v. Amundson,* 343 N.W.2d 78, 86–87 (N.D. 1983) (examination of accident site by jurors after submission of the case prejudicial where misconduct was not discovered until after a verdict was rendered, precluding opportunity to cure the error by determining the nature of extraneous information and instructing the jurors to decide the case on evidence produced in court); *State v. Cox,* 322 N.W.2d 555, 557–60 (Minn. 1982) (sheriff's disparaging comments about defendant during trial overheard by jurors properly cured by court's voir dire of jurors and curative instructions); *Sher v. Stoughton,* 666 F.2d 791, 793–95 (2d Cir. 1981) (anonymous telephone call to jurors telling them to convict defendant and give him the electric chair cured prior to deliberations by prompt action of the trial judge including curative instructions). *See also United States v. Bagnariol,* 665 F.2d 877, 884 n.3 (9th Cir. 1981) (listing curative instructions as one means of resolving juror misconduct of bringing in extrinsic evidence).

Ultimately, the determination of whether juror miscon-
duct in interjecting evidence dehors the record affected the
verdict is within the discretion of the trial court.

The effect which this evidence may have had upon the
jury was a question which was properly determined in
the sound discretion of the trial court which had
observed all the witnesses and the trial proceedings and
had in mind the evidence which had been presented. If
the trial court had any doubt that the misconduct
affected the verdict, it was obliged to resolve that doubt
in favor of granting a new trial. *Gardner v. Malone,
supra; Lyberg v. Holz,* [145 Wash. 316, 259 P. 1087
(1927), *aff'd,* 146 Wash. 698, 263 P. 960 (1928)]. The dis-
cretion of the trial court was properly exercised.

*Halverson v. Anderson,* 82 Wn.2d 746, 752, 513 P.2d 827
(1973).

Our review of the record convinces us that the action
taken by the trial court minimized the effect of the miscon-
duct, which was itself of little significance, and that there
was no reasonable doubt that the misconduct did not affect
the verdict.[24] We find no abuse of discretion in the denial

[24]Raymark cites several cases for the proposition that the injection of infor-
mation as to a defendant's ability to pay for damages or insurance coverage is
irrelevant and so prejudicial that a new trial is required. *See Miller v. Staton,* 64
Wn.2d 837, 840, 394 P.2d 799 (1964); *King v. Starr,* 43 Wn.2d 115, 118–23, 260
P.2d 351 (1953); *Cramer v. Van Parys,* 7 Wn. App. 584, 593–94, 500 P.2d 1255
(1972). None of these cases involved juror misconduct, and are therefore distin-
guished. *Miller* and *Starr* both involved misconduct of defense counsel who made
references to the defendants' lack of insurance coverage in personal injury cases.
The court in *Starr* focused on the deliberate nature of the disclosure, noting the
long–established rule that where such information is placed before the jury inad-
vertently, a mistrial will not be granted. *Starr,* at 118–19. In that case the court
held that the defense counsel's deliberate reference to insurance was not cured by
the trial court's actions. *Starr,* at 122–23. More analogous here is the more recent
case of *Williams v. Andresen,* 63 Wn.2d 645, 388 P.2d 725 (1964). The court
refused to grant a new trial in that personal injury case where the day before the
jury received the case a Seattle newspaper article about the trial stated the
defendants were covered by insurance. The court held that "the introduction into
the minds of the jurors of knowledge of the fact of insurance . . . was . . . not a
proper ground for the granting of a motion for a new trial", *Williams,* at 649,
affirming the trial court's denial where it also concluded that this knowledge did
not affect the jury verdict which was not challenged as excessive. Here, the mis-

of Raymark's motion for a new trial.

## POST–JUDGMENT SETTLEMENTS

Subsequent to entry of judgment and the filing of the notice of appeal to this court several of the defendants reached settlements with Lockwood. These settlements were approved by this court through action of the court commissioner who held a reasonableness hearing pursuant to the provisions of RCW 4.22.060. That statute provides in pertinent part:

> A party prior to entering into a release, covenant not to sue, covenant not to enforce judgment, or similar agreement with a claimant shall give five days' written notice of such intent to all other parties and the court. The court may for good cause authorize a shorter notice period. The notice shall contain a copy of the proposed agreement. A hearing shall be held on the issue of the reasonableness of the amount to be paid with all parties afforded an opportunity to present evidence. A determination by the court that the amount to be paid is reasonable must be secured. If an agreement was entered into prior to the filing of the action, a hearing on the issue of the reasonableness of the amount paid at the time it was entered into may be held at any time prior to final judgment upon motion of a party.

It is clear from the plain meaning of the words of the statute that post–judgment settlements are contemplated. Raymark argues that the statute only applies at the trial court level and does not contemplate settlement during an appeal. Raymark also argues that an appellate court has no jurisdiction under the statute to conduct a reasonableness hearing, such fact–finding hearings being the province of trial courts.

■ The determination that a settlement is reasonable is a finding of fact which must be supported by substantial evidence. *Glover v. Tacoma Gen. Hosp.*, 98 Wn.2d 708, 718, 658 P.2d 1230 (1983). Although an appellate court will nor-

---

conduct was from one of the jurors rather than from the deliberate actions of one of the parties and there is no claim the verdict is excessive.

mally not reexamine the evidence to make its own findings of fact in cases on appeal, *see* Washington State Bar Ass'n, *Washington Appellate Practice Handbook* § 5.3 (Supp. 1984), nothing in the governing statutes, Rules of Appellate Procedure, or the common law precludes an appellate court or one of its officers from making such findings of fact as are necessary to determine the reasonableness of a settlement or from conducting a hearing where evidence of reasonableness is received. Here, the reasonableness determination challenged by Raymark was a finding based on evidence presented to the court commissioner rather than a finding derived solely from the record as constituted below.

Except as specifically provided in the rules, the trial court loses the power to act when the Court of Appeals assumes jurisdiction. *See* RAP 7.2.[25] RAP 7.3 provides the appellate court with the authority "to perform all acts necessary or appropriate to secure the fair and orderly review of a case." In addition, RCW 2.06.030 contains similar authority. Because a reasonableness hearing is not the type of fact–finding which occurs in an original proceeding nor one antithetical to appellate jurisdiction we believe that jurisdiction to conduct such a hearing resides in both the appellate court and the trial court. The construction of the

---

[25]RAP 7.2(e) provides:

The trial court has authority to hear and determine (1) postjudgment motions authorized by the civil rules, the criminal rules, or statutes, and (2) actions to change or modify a decision that is subject to modification by the court that initially made the decision. If the trial court determination will change a decision then being reviewed by the appellate court, the permission of the appellate court must be obtained prior to the entry of the trial court decision. A party should seek the required permission by motion. The decision granting or denying a postjudgment motion may be subject to review. A party may only obtain review of the decision on the postjudgment motion by initiating a separate review in the manner and within the time provided by these rules. If review of a postjudgment motion is accepted while the appellate court is reviewing another decision in the same case, the appellate court may on its own initiative or on motion of a party consolidate the separate reviews as provided in rule 3.3(b).

While there is no reason that a post–judgment settlement hearing could not be conducted in the trial court, permission of the appellate court is required.

statutes and rules involved advocated by Raymark would detract from the orderly administration of justice in many cases and would add nothing to the process in this case.

Raymark also argues that application of RCW 4.22.060 at the appellate court level may constitute a deprivation of due process by extinguishing a right to contribution which was established with the trial court's judgment. Raymark nowhere argues that it was denied an opportunity to be present at the hearing or to present evidence as to the reasonableness or lack of reasonableness of the settlements. Nor has Raymark challenged the commissioner's finding that the settlements were reasonable. Until all appeals are final, Raymark's "right to contribution" which it wishes to protect is not a vested right by virtue of the trial court judgment. *Johnson v. Continental West, Inc.*, 99 Wn.2d 555, 563, 663 P.2d 482 (1983). Where there is no vested right it is not "extinguished" by operation of RCW 4.22-.060.

In this case the court commissioner examined documentary evidence and heard argument on the reasonableness of the settlements, then determined that they were in fact reasonable. The commissioner's authority to make the ruling is upheld and the otherwise unchallenged finding of reasonableness affirmed.

## Unfair Surprise

The trial court granted Pittsburgh Corning a new trial on the grounds that introduction and identification at trial of a color photograph of Pittsburgh Corning's products by Lockwood constituted an unfair surprise where the photograph had inadvertently not been disclosed in discovery. This ruling was made after trial. At trial the evidence was first presented on a motion to reopen by Lockwood. Pittsburgh Corning objected strenuously. It requested that the evidence not be admitted or used for the purpose of refreshing Lockwood's recollection, and in the alternative, for a mistrial or the granting of a continuance to develop rebuttal witnesses. All these motions were denied and the

evidence was admitted. Subsequent to the conclusion of the trial the court reversed itself and granted Pittsburgh Corning's motion for a new trial.

The standard of review for a motion granting or denying a new trial is abuse of discretion. A stronger showing of abuse is required to reverse an order granting a new trial than an order denying one. *State v. Taylor,* 60 Wn.2d 32, 39, 371 P.2d 617 (1962); *Gardner v. Malone, supra* at 846.

In this case the trial court found Pittsburgh Corning had been prejudiced by the surprise admission of direct evidence which had not been produced during discovery. The court found the admission of the photograph and its identification by Lockwood "materially affected the substantial rights" of Pittsburgh Corning since the case did not develop in the way anticipated after discovery. Pittsburgh Corning was thus unable to conduct as thorough and penetrating a cross examination of Lockwood as it would have with more notice, or able to provide the additional evidence which it was able to develop after trial. The trial court specified it was not granting the new trial simply because of the newly discovered evidence. It stated that an error of law occurred during the trial and that different actions should have been taken to avoid putting Pittsburgh Corning in the hardship position of facing such devastating surprise evidence.

Surprise has been eliminated as one of the bases for permitting the exclusion of relevant evidence under ER 403 and Fed. R. Evid. 403 except for circumstances which amount to prejudice. *See* Comment, ER 403; 1 J. Weinstein & M. Berger, *Evidence* ¶ 403–403[1], at 3, 19–21 (1985). The preferred approach is to grant a continuance to permit the opposing party to prepare for the evidence. The trial court ruled that it erred in not granting the continuance or taking some other curative action during the trial. It also ruled that under the current rules of evidence and in the context of this specific case the claim of surprise was valid even though the evidence went to the heart of the case of product identification and for which they should have been

prepared. The court held that a new trial was the proper remedy to correct the error. This ruling was not an abuse of discretion and will not be disturbed. *Pincus v. Puget Sound Brewing Co.*, 18 Wash. 108, 112–14, 50 P. 930 (1897) (order granting new trial reversed where continuance not requested); *Walgraf v. Wilkeson Coal & Coke Co.*, 65 Wash. 464, 466–67, 118 P. 343 (1911) (order granting new trial affirmed where continuance was requested and denied); *State v. McKenzie*, 56 Wn.2d 897, 901, 355 P.2d 834 (1960) (order granting new trial reversed where no objection had been made or continuance requested). Only the trial court could assess the impact of the surprise evidence.

Having found no reversible error, we affirm the judgment.

## APPENDIX

### JURY INSTRUCTIONS PERTINENT TO THIS APPEAL

#### PRODUCT LIABILITY AND NEGLIGENCE
#### No. 2

Plaintiffs, Albert and Dorothy Lockwood, bring this lawsuit against defendants, Eagle–Picher Industries, Inc.; Keene Corporation; Raymark, Inc.; The Celotex Corporation, successor in interest to Philip–Carey Manufacturing Company; and Pittsburgh–Corning Corporation; to recover compensation for personal injuries allegedly sustained by Albert Lockwood and their marital community.

Albert and Dorothy Lockwood contend that Mr. Lockwood has developed a lung disease called asbestosis proximately caused by exposure to and inhalation of asbestos fibers emitted from products manufactured and/or sold by these defendants.

Plaintiffs bring this action on the basis of two separate claims:

(1) Product liability; and

(2) Negligence.

Each instruction will have a heading at the top indicating whether the instruction applies to the theory of product liability, or negligence, or both.

With respect to plaintiffs' product liability claim, Albert and Dorothy Lockwood claim that each defendant manufactured and/or sold products which were not reasonably safe for use because:

(1) These products contained asbestos, which was not reasonably safe

to human life and health; and

(2) These products did not contain adequate warning of the precise dangers involved with asbestos use.

With respect to plaintiffs' negligence claim, plaintiffs contend that the defendants were negligent in one or more of the following respects:

(1) Failure to test the products;

(2) Failure to remove the products from the market;

(3) Failure to inform users of handling methods;

(4) Failure to warn foreseeable product users of the dangers of asbestos.

The plaintiff claims that one or more of these acts was a proximate cause of injuries and damage to the plaintiff. Defendants deny these claims and, further, deny the nature and extent of the plaintiff's claimed injuries.

The foregoing is merely a summary of the claims of the parties. You are not to take the same as proof of the matter claimed unless admitted by the opposing party, and you are to consider only those matters which are admitted or established by the evidence. These claims have been outlined solely to aid you in understanding the issues.

### PRODUCT LIABILITY & NEGLIGENCE
### No. 3

With respect to plaintiffs' product liability claim, the plaintiff has the burden of proving each of the following propositions:

First, that the defendant supplied a product which was not reasonably safe at the time the product left the defendant's control, or defendant failed to give an adequate warning necessary to make the use of the product reasonably safe;

Second, that the plaintiff was injured; and

Third, that the unsafe condition of the product and defendant's failure to warn was a proximate cause of the plaintiff's injury.

With respect to plaintiffs' negligence claim, the plaintiff has the burden of proving each of the following propositions:

First, that a defendant acted, or failed to act, in one of the ways claimed by the plaintiff and that in so acting or failing to act, a defendant was negligent;

Second, that plaintiff Albert Lockwood was injured;

Third, that the negligence of one or more of the defendants was a proximate cause of injury and damage to plaintiff.

### PRODUCT LIABILITY
### No. 7

A manufacturer has a duty to supply products which are reasonably safe for use at the time they leave the manufacturers control. A product is considered "not reasonably safe" or "unreasonably dangerous" if it is

unsafe in a way or to an extent beyond that which an ordinary user would reasonably contemplate when using it in a foreseeable manner. In determining what an ordinary user would reasonably expect, you should consider the seriousness of the potential harm from the claimed defect, the cost and feasibility of eliminating or minimizing the risk, and such other factors as the nature of the product and the claimed defect indicate are appropriate.

PRODUCT LIABILITY
Instruction No. 8

The words "not reasonably safe" refer not only to the condition of the product itself, but a product may also be "not reasonably safe" because of failure to give sufficient directions to the ultimate users as to how to use the product in order to make the product safe and/or the failure to give adequate warnings as to the specific dangers or risks associated with the product.

PRODUCT LIABILITY
Instruction No. 9

Both seller and a manufacturer have a duty to warn of any condition which renders a product not reasonably safe for a foreseeable use. There is, however, no duty to warn of obvious or known dangers.

Where a warning is required, it must be adequate so that, if followed, the product would be reasonably safe for use. The warning must be appropriate in view of the seriousness of any danger involved to reasonably advise of the consequences of improper use. Such a warning must be in a form which reasonably could be expected to catch the attention of, and to be understood by, the ordinary user.

NEGLIGENCE
No. 11

Negligence is to be judged in light of circumstances or knowledge existent at the time of the occurrence. It is a question of what reasonable men with common sense under the same or similar circumstances, and at the same or similar time, would or should have anticipated in the exercise of reasonable care.

NEGLIGENCE
Instruction No. 12

A manufacturer's duty to exercise ordinary care is bounded by the foreseeable range of danger. In order to recover on the theory of negligence, plaintiff must prove that the defendant should have anticipated an unreasonable risk of danger to him or to other workers of his class.

NEGLIGENCE
No. 13

In determining the scope of a manufacturer's duty to warn of dangers

associated with its products, a manufacturer is under a duty to test, analyze and inspect such products, and is charged with knowing what such tests would have revealed.

In this respect, a manufacturer is held to the knowledge and skill of an expert in determining the dangers that may be inherent in its products. The manufacturer has a duty to keep abreast of research and knowledge in the field.

Once a manufacturer had knowledge of some danger associated with the use of its products, it is afforded a reasonable time, under the circumstances, to warn potential users of such danger.

PRODUCT LIABILITY & NEGLIGENCE
Instruction No. 18

Evidence may be either direct or circumstantial. Direct evidence is that given by a witness who testifies concerning facts which the witness has directly observed or perceived through the senses. Circumstantial evidence consists of proof of facts or circumstances which, according to common experience, permit a reasonable inference that other facts existed or did not exist. The law makes no distinction between the weight to be given to either direct or circumstantial evidence. One is not necessarily more or less valuable than the other.

No. 20b

The jury is instructed that should there be a finding of liability for the plaintiff against any defendant the financial circumstances of the particular defendant or defendants is not to be considered by the jury in determining the amount of damages proximately resulting from a defendant's liability, if any.

SCHOLFIELD, C.J., and COLEMAN, J., concur.

Review granted by Supreme Court October 29, 1986.